LENA J. DUNGAN, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, February 16, 1914.

1. **NEGLIGENCE: Railroads: Personal Representative: Widow.** The plaintiff, a widow, sued the defendant for the negligent death of her husband. She sued, not in the capacity of a personal representative under the Federal Law, but as the widow under the statute of Kansas. After judgment in her favor, she entered her appearance as administratrix of her husband's estate, and adopted all of her acts in the suit, as the widow. Her husband was a locomotive engineer, and while operating one of defendant's engines, just as the train was entering Olathe, Kansas, the boiler exploded and he was killed. *Held,* that an administratrix cannot adopt a judgment after it has been rendered in favor of an individual, but under the Federal Law she must sue as the personal representative (177 Mo. App. 155).

2. **INSTRUCTIONS: Singling out Testimony of Witness.** An instruction, which stated that unless the jury believed the fireboxes, referred to by the witness Purdue, were of the same shape as one which was on the engine that exploded, they should entirely disregard his testimony, is erroneous, because the effect of this instruction was to single out Purdue's testimony and was a negative form of comment on it.

Appeal from Jackson Circuit Court.—*Hon. James E. Goodrich,* Judge.

REVERSED AND REMANDED.

*Cowherd, Ingraham, Durham & Morse* and *W. F. Evans* for appellant.

*Henry J. Latshaw* for respondent.

TRIMBLE, J.—This suit is as nearly "on all fours" with the case of Daisy Vaughan v. St. Louis and San Francisco Railroad Company, 177 Mo. App. 155, as it is possible for a case to be when based on a death occurring at a different time and place and alleging different acts of negligence. So far as the nature of the pleadings, the steps taken in the trial court, and the questions of law presented thereby are concerned, the cases are identical.

Plaintiff brought suit as the widow of John Dungan, deceased, November 7, 1910, for the death of her husband which occurred September 20, 1910, while he was in the employ of defendant as an engineer and engaged in moving a train in interstate commerce.

The only difference in the petition from that in the Vaughan case was in the dates, the occupation of deceased, and the specification of negligence. The suit was filed November 17, 1910; an amended petition was filed November 7, 1911, and a verdict of $4000 and judgment thereon were entered March 2, 1912, in favor of Mrs. Dungan as widow. Motions for new trial and in arrest were filed on the same day and the case was continued on said motions.

Six months and seven days later, to-wit, on September 9, 1912, Mrs. Dungan was appointed Administratrix of the estate of John Dungan, deceased, by the probate court of Jackson county, Missouri, and at the November term, 1912, of the circuit court of Jackson county, Missouri, in which the suit had been tried, Mrs. Dungan filed in said cause an "Entry of Appearance of Plaintiff as Administratrix of Her Deceased Hus-

band, John Dungan, and Adoption of Proceedings in Her Behalf Herein." This paper was filed December 5, 1912, while the motions for new trial and in arrest were pending and undisposed of.

On December 14, 1912, the court overruled the motions for new trial and in arrest, the defendant objecting and excepting. On December 31, 1912, the order overruling these motions was, by agreement of parties set aside. Thereupon, after argument upon defendant's motion for a new trial, the court sustained said motion "for the reason that this cause is necessarily based on the Federal Employers' Liability Act, and under the decisions of the Supreme Court of the United States in 224 U. S. Reporter at page 547 plaintiff states no cause of action in herself as widow."

Thereafter, on the same day, Mrs. Dungan filed her motion to set aside the order sustaining defendant's motion for a new trial, and the court on Mrs. Dungan's motion set aside its order granting a new trial, defendant objecting and excepting.

Thereafter, on the same day, December 31, 1912, Mrs. Dungan requested the court to allow her to enter her appearance as administratrix in accordance with her "adoption of proceedings" filed December 5, 1912, and offered in evidence before the court, over the objections and exceptions of defendant, a certified copy of her appointment as administratrix. The court sustained the request and permitted the administratrix to become a party. Defendant objecting and excepting.

Thereafter, on the same day, the court overruled defendant's motions for new trial and in arrest, and defendant then appealed.

Deceased left no children and the petition so stated, and also stated that no administration was had on his estate, and the petition so alleged at the time of the rendition of the judgment. Defendant's answer raised the same defenses as in the Vaughan case, and a

demurrer to the evidence was offered by defendant and overruled. Deceased was killed while in the employ of defendant a common carrier engaged in interstate commerce. It is thus seen that the case, in all its legal aspects, is identical with the Vaughan case. We have carefully considered all the briefs in both of the cases, and are of the opinion that the conclusion therein reached is correct and must be followed, at least as regards the right of the administratrix to ''adopt'' a judgment after it has been rendered in favor of an individual. To allow this would be to introduce a new and unheard of method of procedure, one not heretofore authorized, and which if established, would lead to unknown complications and difficulties which cannot now be foreseen. The one most apparent now is that it would obviate the necessity of proving one of the essential facts necessary to be proved in order to support a judgment, and would permit a party to come in afterward and supply that proof and preclude the defendant from contesting that proof before the jury. It is unnecessary to repeat here what is said in the Vaughan case on the question now under consideration. For the sake of brevity and space we refer to the opinion in the Vaughan case and make it a part hereof.

The cause of the death was the explosion of the boiler on the engine deceased was driving. It occurred just as the train was entering Olathe, Kansas, on its trip from Kansas City, Missouri to Fort Scott, Kansas.

The petition alleged, in substance, that the cause of the explosion was the carelessness and negligence of defendant in furnishing for plaintiff's husband an engine which was defective and dangerous in this, that the boiler of said engine and the firebox of said engine and the flue sheets and crown sheet and the stay bolts of said firebox and boiler were defective and dangerous on account of the weakened and worn condition there-

of; that a number of said stay bolts and flues were broken and weakened by use and age and that many of said stay bolts were loose; that the crown sheet and side sheets of said firebox were pitted, worn and eaten away with age, and scales; that defendant negligently failed to inspect said boiler and allowed scale to form therein and negligently failed to remove said scale formations therein, or wash said boiler, and that thereby and on account of said defective condition said boiler was weakened and rendered dangerous and caused to explode.

The defense of appellant was that said boiler did not explode on account of said defects or any of them, but that it was caused to explode by the carelessness of deceased in allowing the water in the boiler to get too low.

Stated in still smaller compass plaintiff claimed that, by reason of defendant's negligence the engine was weak and in bad repair and could not stand the required pressure and exploded on that account and also that scale was negligently allowed to form inside the boiler and was not removed and this combined with the weak condition of the boiler caused it to explode.

Defendant's contention was, as stated, that deceased had carelessly allowed the water to get so low in the boiler as to fall below the "crown sheet." The crown sheet and side sheets form the bottom of the boiler and the top of the firebox. When the intense heat necessary in an engine firebox is applied to this crown sheet and side sheets, unless there is water on the upper side thereof to absorb the heat, which is done to a great extent by the water itself (and to a much larger extent in passing from water into steam), the heat will remain concentrated on the crown sheet and cause it to become soft or melt thus allowing the fire and water to come into contact, converting all the water into steam instantly and producing an explosion. So that if the

water is allowed to get too low an explosion will follow even in a new and perfectly good boiler.

It is also a scientific fact that if intense heat is applied to the crown sheet and sides with no water on their upper side, the sheet and sides will turn blue at such points thus showing that where said color appears the water was not in contact with the sheet.

It was an undisputed fact that after the explosion the metal sheets called the "crown sheet" and "side sheets," composing the firebox, were of a bluish color, indicating conclusively that excessive heat had been applied to those parts of said sheets that were of said bluish color and indicating further conclusively that at the time said heat was applied, the water in the boiler was not in direct contact with that portion of those sheets thus turned blue.

Defendant claimed the reason the water did not get in direct contact with the sheets was because the engineer let the water get too low. Plaintiff claimed that the reason the water did not come in contact with the sheets was because they were covered with scale. Consequently, she says the blue color was not caused by low water. She then relies upon other evidence tending to show that in certain sections of the boiler the stay bolts were worn and broken; that eighty-two to eighty-five flues were worn out; that 200 or more stay bolts were leaking; that the scale had pitted and marked the sheets and rendered them thinner than they should be; and that low water did not cause the explosion because, where low water is the cause, the exposed metal becomes soft under the heat and when the explosion comes the heads of the bolts are "cupped" that is, drawn up like an umbrella turned wrongside out. While, if the water is in direct contact with the sheets and the bolts give way through the force of an explosion, caused in some other way, the heads will be sheared off clean and not cupped.

Now, there was testimony tending to show there was a large quantity of scale around the wreck of the engine after the explosion; that there was scale in parts of the boiler; that the scale would form thicker in some places than in others; and that some of the heads of the bolts were sheared off and some were cupped; that some of those that were cupped were immediately adjoining those that were sheared, showing that the lack of contact of the water sufficient to make them get soft under the intense heat was in spots and not uniform as it would have been had low water been the cause. It is plaintiff's theory that the scale prevented the water from coming in contact with the sheets and thereby produced the blue color and that the scale being much thicker in spots than in others, the heads of the bolts at those spots softened and pulled out and this with the other weak condition of the boiler produced the explosion. Under these circumstances, the question of whether low water caused the explosion or whether it arose from the scale and the ill repair and worn condition in which the engine was in, were for the jury to determine.

There was evidence tending to show that scale an inch in thickness was on the engine; that a piece of scale about seven inches long, and three fourths of an inch thick, and curved like the bark of a tree, was picked up near the engine and that the one who picked it up *fitted it into a curved place on the crown shield.* To meet this testimony, defendant offered evidence to show that the piece of scale would not fit any curve on that firebox because it had no curve in it with so short a radius as the curve in the piece of scale, except on a pipe running through the boiler to the top. But defendant's evidence also showed that the engine No. 632 that blew up was of the usual type used on that road, and the firebox, crown sheet, side sheets and stay bolts were the usual kinds in use at the time of the trial. Thereupon plaintiff put a witness, Perdue, on

the stand who testified that the day before he had examined five of defendant's engines and found a curve where the scale would fit. This was objected to but the objection was overruled. When this testimony was offered one of defendant's witnesses was recalled to the stand, but his testimony, though different in some particulars from what it had been, showed that there were but two types of firebox in use, the "O. G." type and another type, and that the "O. G." type had no such curve. And Perdue having testified that the engines he examined were not the "O. G." type, we do not think it was error to admit Perdue's testimony. His testimony was not offered by plaintiff in the first place to prove where the scale came from. It was offered to rebut defendant's testimony that there was no curve in the firebox which it would fit. While such was defendant's testimony, yet the same testimony stated that the firebox was the usual type in use on the road at that time. Therefore, if those in use at that time had a curve which the scale would fit, this would tend to rebut that part of the defendant's testimony which stated there was no curve on the firebox in question which would fit the scale. The admission of Perdue's testimony was proper.

The evidence of this witness being admissible under the circumstances, there was no need of an instruction bearing on his testimony. The court, however, gave an instruction, lettered C. 1, which told the jury that unless they believed the fireboxes referred to by the witness Perdue were of the same shape as the one which was on the engine which exploded, they should entirely disregard the testimony of said witness. The effect of this instruction was to single out Perdue's testimony and was a negative form of comment on the same. It was a negative way of saying, if you believe the fire boxes he examined were of the same shape as the one that exploded, then in determining the questions as to whether the piece of scale in evidence came

from the exploded engine and what caused the explosion, you will consider the testimony of the witness Perdue. As said, there was no need of the instruction. The jury did not have to be told that if the fire boxes were not the same shape, testimony that the scale fitted them would not prove anything. Consequently, the only effect such an instruction could have would be to emphasize and call attention to the importance of Perdue's testimony. Upon a retrial of the case this instruction should not be given. If it was error to admit Perdue's testimony, the instruction could in no way have cured the error.

The cause is reversed and remanded. All concur.